**UNITED STATES of America, Plaintiff,**

v.

**Mamdouh Mahmud SALIM, Defendant.**

No. 01 Cr 02 (DAB).

United States District Court, S.D. New York.

March 29, 2001.

Dan Himmelfarb, Assistant United States Attorney, Mary Jo White, United States Attorney, Criminal Division, New York City, for United States.

Richard B. Lind, New York City, for Defendant.

## *MEMORANDUM & ORDER*

BATTS, District Judge.

Defendant Mamdouh Mahmud Salim is charged in the instant Indictment with eleven Counts, including participation in a hostage taking conspiracy, an attempted hostage taking, a murder conspiracy, an attempted murder, a conspiracy to escape prison, attempted escape, two Counts of assault of a federal official and three Counts of possession of a weapon in prison.

Defendant Salim now moves for an order transferring venue, pursuant to the Fifth and Sixth Amendments to the Constitution and Federal Rule of Criminal Procedure 21(a), or in the alternative, an adjournment of the commencement of the trial in this case.

## I. FACTUAL BACKGROUND

In January 1999, Defendant Salim and others were indicted on numerous charges

as to a global terrorist conspiracy to murder United States citizens, including those related to the August 7, 1998 bombings of United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. The case, *United States v. Bin Ladin, et al.,* 98 Cr. 1023(LBS) (hereinafter "the Embassy Bombings case"), was assigned to Judge Leonard B. Sand. That trial is expected to continue for several months. (Govt. Lttr. to J. Batts dated March 8, 2001 at 1.)

During the course of the proceedings in the Embassy Bombings Trial, Defendant Salim was housed with the other defendants in the maximum security wing of the Metropolitan Correctional Center ("MCC"). (Govt. Mem. Law at 3.) On November 1, 2000, Correctional Officer Luis Pepe, while at the MCC and allegedly in or near the cell of Defendant Salim, was stabbed. (Gov. Mem. Law at 3.) The indictment in the Embassy bombings case was superseded to include the charges related to the MCC attack, but these charges were severed by Judge Sand and subsequently returned as the instant Indictment before this Court on January 3, 2001.[1]

## II. DISCUSSION

The Fifth and Sixth Amendments to the Constitution guarantee defendants "a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). As such, a transfer of venue is appropriate under Federal Rule of Criminal Procedure 21(a) only if a court is satisfied that "there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law *for holding court in that district."* Fed.R.Crim.P. 21(a). A defendant making a pre-voir dire motion to change venue is

faced with a difficult burden of showing that the nature of adverse pretrial publicity is such that makes a fair trial unlikely, and thus, inherent prejudice must be presumed. *See United States v. Maldonado–Rivera,* 922 F.2d 934, 967 (2d Cir.1990) (quoting *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)). In assessing the risk of inherent prejudice, courts may consider, *inter alia,* the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially. *See id.*

Defendant Salim argues that the widespread prejudicial publicity surrounding this case and the "related" Embassy bombings present a unique set of circumstance which mandate a change of venue: "While defendant Salim's case has technically been severed from the Embassy Bombings trial, he continues to be inextricably linked to the Embassy Bombings trial through witness's testimony regarding his alleged role in the conspiracy." Def. Mem. Law at 2. It is clear that the Embassy Bombings case has engendered substantial news coverage, as is evidenced by the almost daily articles on the Embassy Bombings Trial and the truly international scope of the coverage. *See* Govt. Mem. Law at Ex. 2 (citing over a hundred articles from various local, national and international sources). But the instant offense is one separate and apart from the Embassy Bombings case; to that end, Defendant submits ten articles from the *New York Times* and the *New York Daily News*

---

1. The terrorism charges against Defendant Salim were also severed from the larger indictment in the Embassy bombings trial and remain before Judge Sand.

which explicitly discuss the Embassy bombings, the MCC stabbing and Defendant Salim in tandem. Defendant also argues that "recent testimony in the Embassy Bombings case—from a multitude of victims—has been extremely prejudicial to Salim." Def. Reply Aff. ¶ 6.

Even assuming, arguendo, that the ten articles constitute pervasive publicity for the purposes of this case, it is well-settled that substantial publicity alone is not enough to require a change in venue. *See Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) ("[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair."); *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (jurors need not be totally ignorant of the facts and issues of the underlying charges to provide defendants with a fair trial); *see also United States v. Stevens*, 83 F.3d 60, 65 (2d Cir. 1996) (same).

Presumed prejudice depends instead upon whether the coverage is so unduly prejudicial or inflammatory to this particular Defendant that despite careful voir dire questioning, there is a reasonable likelihood that an impartial jury simply cannot be empaneled. *See Beck v. Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962) (holding presumed prejudice exists where "a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law."); *see also United States v. Livoti*, 8 F.Supp.2d 246, 249 (S.D.N.Y. 1998) (even if defendant had submitted specific and current media articles to support claim of adverse publicity, defendant "failed to show that an impartial jury cannot be selected following careful voir dire questioning."). Accordingly, prejudice is presumed in the context of pretrial publici-

ty very rarely and only in extreme circumstances. *See, e.g., Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (finding presumed prejudice where 20–minute film of police interrogation during which defendant confessed to murder was broadcast three times to the small community where the crime and trial took place); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (finding presumed prejudice where the murder of six members of one family had caused a "huge wave of public passion" in a small Indiana community); *see also United States v. Volpe*, 42 F.Supp.2d 204, 216 (E.D.N.Y.1999) (finding in highly publicized Abner Louima police brutality case that the atmosphere was not "comparable to the prejudicial conditions engendered by the media in other Supreme Court cases finding presumed prejudice."); *Briley v. Bass*, 584 F.Supp. 807, 826 (E.D.Va. 1984) (finding that massive pretrial publicity was "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession.")

A factor relevant to such a determination of prejudice is the nature of the publicity itself, particularly where publicity of a factual rather than inflammatory (e.g., discussing the Defendant's guilt or innocence) character mitigates against a finding of presumed prejudice. *See Murphy*, 421 U.S. at 802, 95 S.Ct. 2031 (news articles "largely factual in nature"); *Maldonado–Rivera*, 922 F.2d at 967 ("Many of the articles were simply factual accounts of the frequent court proceedings."); *United States v. Haldeman*, 559 F.2d 31, 50–51 (D.C.Cir.1976) (finding that extensive publicity in the Watergate case was factual, straightforward, and unemotional). Defendant Salim argues that the press reports here are of an inflammatory nature, in that he has been portrayed in the press as "disingenuous, suicidal, desperate, disrup-

tive, and seemingly overwrought by the American criminal justice system," while the victim is portrayed as an "angelic, humane guard." Def. Mem. Law at 2, 5.

The law, however, requires much more to be inflammatory to the degree required to presume prejudice. The ten articles submitted by Defendant for the Court's review do not meet that high threshold. Rather, the vast majority of the articles consisted of factual accounts of the court proceedings in the Embassy bombings case (Def. Aff. at Ex. A, C), the circumstances and nature of the charges surrounding the stabbing, as described in the instant Indictment (Def. Aff. at Ex. B, G, H, I, J), and the novel legal questions faced by Judge Sand in the Embassy Bombings Trial (Def. Aff. at Ex. F).

The only two articles which can be said to focus actually upon Defendant Salim rather than the stabbing itself are also not inflammatory; instead, one is over two years old and both repeatedly point to the Defendant's vehement claims of innocence and his claim of being framed by a top financial aid to Osama bin Ladin. *See* Def. Aff at Ex. D ("[Salim] also said that he was opposed to violence ...' It is unimaginable for me that anyone should kill innocent civilians'"); Def. Aff. at Ex. E ("[Salim] said to me: 'I'm going to tell you everything you want to know. I'm going to prove my innocence,' said Mr. Folger, a police inspector in Munich ...' It was Mr. Salim who wanted to—insisted on continuing with this interrogation,' Mr. Folger testified 'He wanted to prove that the accusations were not valid.'"); *cf. Volpe*, 42 F.Supp.2d at 217 (noting in its analysis that some of the press reports have been favorable to the defendants).

Similarly, Defendant's argument that a Government witness' testimony, as related in a single *New York Times* article, that Defendant Salim offered a justification for the killing of innocent civilians (Def.Aff.¶ 7) continues to be "conspicuously mentioned in trial testimony, as reported in press accounts" is without merit.[2] Nor can Defendant's contention that the few press reports indicating that the victim of the stabbing was highly regarded effectively "demonizes" Defendant Salim be credited. These were isolated instances of press reporting which fail to illustrate the deeply rooted pattern of prejudice necessary to show that an impartial jury cannot be selected in this district despite careful voir dire questioning.

Moreover, it is clear, as Judge Duffy observed in the World Trade Center Bombing trial in 1993, that the jurors from this district, as one of the largest and most diverse districts in the country, are able, if not better suited, to rise to the occasion of trying this case with an open mind. *See United States v. Salameh*, S5 93 Cr. 0180, 1993 WL 364486 at *1 (S.D.N.Y. Sept. 15, 1993) (denying motion for a change of venue arising from Defendant's notoriety due to a conviction in the same district on highly publicized terrorist charge); *see also CBS, Inc. v. U.S. District Court*, 729 F.2d 1174, 1181 (9th Cir.1984) ("The size and heterogeneity of such communities make it unlikely that even the most sensational case will become a 'cause celebre' where '[t]he whole community ... becomes interested in all the morbid details.'") (quoting *Estes v. Texas*, 381 U.S. 532, 545, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965)); *United States v. Dioguardi*, 428 F.2d 1033, 1039 (2d Cir.1970) ("transfer from a metropolitan area to a smaller city

---

**2.** The Government indicates there has been only one other mention of Defendant Salim in the Embassy Bombing Trial to date, by a witness who stated he had never heard the Defendant giving a justification for killing civilians. *See* Govt. Mem. Law at Ex. 1.

may result in more rather than less intensive publicity.").

Defendant's reliance on the granting of a venue change by the court in the Oklahoma City bombing case, *United States v. McVeigh*, 918 F.Supp. 1467, 1472 (W.D.Okla.1996), is misplaced. As the *McVeigh* Court indicated, the voluminous and comprehensive Oklahoma press coverage included extensive interviews with injured victims and members of the victims' families, the broadcast of the very public arrest of Timothy McVeigh surrounded by a mob shouting "baby killer", the television stations' showing of reconstructions and simulations of alleged events, and the prevalence of the theme of the bombing as a particular "Oklahoma tragedy." The pretrial publicity essentially functioned to create such a strong emotional and community response that the Court had serious doubt in the ability of all Oklahoma jurors to feel anything but a personal stake in the outcome. *See McVeigh*, 918 F.Supp. at 1473 ("[Inability to be objective] is also true when there is such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience."). That is simply not the case here, where a handful of articles, only two of which can be characterized as being anything other than factual recitations, have not gripped the community to a degree that presumed prejudice is appropriate.

Accordingly, Defendant Salim's alternative request to delay this case pending the resolution of the Embassy Bombings trial is similarly denied.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for a change of venue and request to delay the trial is denied.

Parties are to attend a status pre-trial conference to be held on Monday, April 9, 2001 at 2:30 PM.

SO ORDERED.