UNITED STATES of America,
Plaintiff,

v.

Mamdouh Mahmud SALIM, Defendant.

No. S1 01 CR. 02(DAB).

United States District Court,
S.D. New York.

March 11, 2002.

Dan Himmelfarb, Robert Bueler, for U.S.

Richard Lind, for Salim.

### OPINION

BATTS, District Judge.

The superseding indictment in this case contains ten counts relating to the stabbing of a correctional officer on November 1, 2000, including conspiracy to escape and attempted escape, conspiracy to take hostages and attempted hostage-taking, con-

spiracy to commit murder and attempted murder, assault, and weapon possession.

The Defendant now moves for the following relief: (1) a change of venue, pursuant to the Fifth and Sixth Amendments of the Constitution and Rule 21(a) of the Federal Rules of Criminal Procedure; (2) preclusion of a photograph of the stabbing victim's face pursuant to Federal Rule of Evidence 403 and admission of only one of three other photographs of the victim on the basis that they are needlessly cumulative; and (3) preclusion of testimony regarding latent fingerprints, pursuant to Fed.R.Evid. 702.

## I. BACKGROUND

On February 22, 2001, Salim moved for a change of venue based upon the prejudicial effect of the publicity generated by press reports of the Embassy Bombings case and the stabbing case. On March 29, 2001, this Court denied that motion. Roughly four months later, Salim made a second motion for a change of venue following the publicity generated by the death penalty proceeding against a convicted conspirator in the Embassy Bombings case, Khalfan Khamis Mohamed[1], which was summarily denied by this Court on July 11, 2001.

At a status conference held August 24, 2001, this Court set a trial date of September 19, 2001. At a status conference held September 18, 2001, that trial date was subsequently adjourned for at least three months in light of the September 11, 2001, terrorist attacks on the World Trade Center in New York City and the Pentagon in Washington DC. See 9/18/01 Tr. at 25.

Salim now moves for a change of venue on the basis of the widespread pretrial publicity surrounding September 11, 2001 and the alleged prejudicial implications on the ability of Salim to receive a fair trial in the Southern District of New York. In support of his motion, Salim submits for the Court's consideration the results of a public opinion survey ("Venue Survey") conducted during a two-week period in early January 2002 by the survey research firm, Social Science Survey Center, in six federal judicial districts: the Southern District of New York, the Eastern District of Michigan, the Northern District of Iowa, the Central District of California, the District of Colorado, and the Southern District of Florida.

Salim also submits an affidavit from Professor Edward J. Bronson ("Aff."), a political scientist and a seasoned consultant to attorneys on the efficacy of various voir dire and jury selection procedures, and on the effect of pretrial publicity on fair trial rights through evaluative surveys. (Aff.¶ 8.) Based upon the survey data and Professor Bronson's review of the instant Indictment, various hearing transcripts, media articles, and certain Court Orders, Professor Bronson has submitted an affidavit setting forth his analysis of the effect of pretrial publicity and emotions in a post September 11, 2001 world on the instant trial ("Report"), as well as a Reply affidavit to clarify matters raised in the Government's response.

Professor Bronson's Report highlights the survey results he views as most significant for the fair trial rights of Salim in New York city, including, *inter alia:* (1) actual case recognition of the stabbing of Officer Pepe was "low, approximately 20 percent in New York, and somewhat lower

---

1. Evidence of the attack on Officer Pepe was presented to the jury in that death penalty proceeding, as the Government's theory was that Mohamed conspired with Salim on November 1, 2000.

elsewhere"[2] (Aff.¶ 16); (2) upon aided recall, 26.8% of New Yorkers correctly remembered that Salim faces charges relating to the Embassy Bombings, although Professor Bronson states "Of course, this was aided recall, and not that many actual New York jurors are likely to recall that Mr. Salim is facing the bombing charges. However, the risk is much higher in New York than elsewhere." (Aff.¶ 17); (3) 58% of New York respondents were "personally affected" by the September 11, 2001 attacks while the range in other districts was between 19.4% (CO) and 33.9% (MI) (Aff.¶ 18); (4) when asked about the ability of jurors from their respective districts to be fair to a perceived Arab national, Professor Bronson found that overall "almost half" of people thought it would be difficult for their fellow citizens to be fair; New York was higher than the average of the other jurisdictions at 49.6%[3] (Aff.¶ 19).

Ultimately, Professor Bronson concludes that the Survey cannot support a demonstrably true link between the deleterious impact of the events of September 11, 2001 and Salim's fair trial rights: "[W]hile there are some reasons to believe that a change of venue would be appropriate, the data do not provide the sort of clear and convincing empirical evidence that would mandate a change of venue, using the traditional ways that a venue survey measures prejudice. . . . The survey . . . cannot provide strong evidence on the linkage between the special prejudice in New York arising from the events of September 11 and the fair trial rights of the defendant." (Aff.¶¶ 20–21.)

In support of his *in limine* motion seeking photograph preclusion, Defendant submits four color photographs depicting the victim after the stabbing.

## II. DISCUSSION

### A. Change of Venue

As previously discussed by this Court in *United States v. Salim*, 151 F.Supp.2d 281 (S.D.N.Y.2001), Rule 21(a) of the Federal Rules of Criminal Procedure mandates a transfer of venue only if a court is satisfied "that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." Fed. R.Crim.P. 21(a). Traditional factors for assessing the risk of presumed prejudice include but are not limited to, the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendant charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially. *See United States v. Maldonado–Rivera*, 922 F.2d 934, 967 (2d Cir.1990). To succeed on a motion to change venue, the Defendant must show a "reasonable likelihood" that prejudicial news prior to trial will prevent a fair trial. *Id.* at 966–67.

Formerly, this Court found that the nature of the pretrial publicity in this case failed to illustrate the extreme circumstance of a deeply rooted pattern of preju-

---

**2.** Given the relatively small sample sizes for the actual number of interviews completed in the five jurisdictions outside of New York and the resultant high margin for error, the survey results of those outside districts are not useful individually; they therefore have been used as a collective comparison to New York.

**3.** New York's percentage is 14.7% higher than the average of the other five districts (34.9%). (Aff.¶ 19)

dice necessary to show that an impartial jury could not be selected in the Southern District of New York despite careful voir dire questioning. *See Salim I,* 151 F.Supp.2d at 283 (listing cases). Specifically, this Court distinguished this case at the time from the *McVeigh* case, *U.S. v. McVeigh,* 918 F.Supp. 1467, 1473 (W.D.Okla.1996), where that Court had serious doubt in the ability of all Oklahoma jurors to feel anything but a "personal stake in the outcome."

Indeed, such absence of pervasive case-specific recognition seems to be fully supported by the instant Venue Survey and Report. As Bronson states: "Case recognition of the stabbing of Officer Pepe was low" and "not that many actual New York jurors are likely to recall that Mr. Salim is facing the bombing charges." *See* Aff. ¶¶ 16, 17. The central question facing this Court now, then, is whether, even absent the prevalence of case-specific prejudicial pretrial publicity, the events of September 11, 2001 have so incapacitated potential jurors drawn from the Southern District of New York that a fair trial here for Salim would be unlikely.

Defendant urges this Court to do just that, upon a theory that prejudice arises because of the "seamless web that associates [Salim] in the embassy bombings, the 9/11 bombings, the Metropolitan Correctional Center—and who is housed there—and his Arab name and appearance." Def. Mem. Law at 5 (quoting Aff. ¶ 3). The Government urges this Court to find that the instant case, in which the crimes charged are not crimes of terrorism, "has nothing to do with terrorism in general or the World Trade Center attack in particu-

lar." Govt. Mem. Law at 5. The Government points, specifically, to the fact that no evidence will be presented in the Government's case-in-chief that Salim has any connection to a terrorist group. *See id.*

The Government's response, however, does not address the eventuality that through a possible defense case, Salim will indeed be associated with crimes of terrorism, not on the Government's case-in-chief, but on the Government's possible rebuttal case.[4] The Court cannot wait until after trial has commenced to contemplate such a contingency. It is the Court's responsibility to assess the possible prejudicial effect of pretrial publicity based upon the possibility that evidence connecting Salim to terrorism may be presented.

Having done so, the Court concludes that the Defendant does not meet the high standard necessary to establish presumed prejudice so that careful voir dire questioning and other methods aimed at garnering a fair trial are rendered futile. Defendant's own consultant found that the Survey demonstrates that "[u]nlike the situation in the Oklahoma bombing, . . . here neither the defendant nor even the crime with which he is charged is well known" and that survey results "made it difficult for [the consultant] to justify that need [to change venue] to the Court." Aff. ¶ 3. Professor Bronson also makes clear that "not that many actual New York jurors are likely to recall that Mr. Salim is facing the [embassy] bombing charges." Aff. ¶ 18.

The Survey reported that New York respondents were slightly over twice as likely to have been personally affected by the tragic events of September 11, 2001 (at

---

4. The Court has previously delineated the narrow circumstances by which the Government's proposed rebuttal case could become relevant. *See* Court's Orders dated August 21, 2001 and August 23, 2001; *see also* Au-

gust 24, 2001 Tr. at 7–11 (discussing circumstances when Government's rebuttal case could become relevant); September 18, 2001 Tr. at 7, 11–12 (same).

58%) and the Report discussed the implication that connection might have for an individual faced with serving as an impartial juror in the instant trial. However, Professor Bronson's observation that "[j]urors who were personally affected by the events of September 11 are an obvious risk to the fair trial rights of Mr. Salim" (Aff.¶ 18), does not mandate a change of venue in and of itself. In questioning potential jurors, it is not the fact that they may have been personally affected by the events of September 11, 2001 that is dispositive; it is their sworn response whether that connection makes it difficult for them to be fair and impartial jurors for the parties in this case. Precautions can function to assure the selection of an unbiased jury. Specifically, careful voir dire questioning on this topic, accompanied by the assembling of a jury pool significantly larger than the normal size, will be sufficient in detecting and eliminating any prospective jurors prejudiced by their personal connection to September 11, 2001.

Finally, the Survey emphasizes what has since become apparent, that the events of September 11, 2001 have had the unfortunate effect of increasing the prejudice and animosity towards Arab nationals nationwide.[5] The Survey found that New York respondents' belief that it would be "hard" for New York jurors to be fair to an Arab national charged in an attack against a correctional officer was at 49.6%, while the average of the other five districts was

34.9%. These results, particularly with a difference of only 14.7%[6], does not translate into a finding of special prejudice in New York City against Arab nationals such that no New York juries can be empaneled which could be fair and impartial. While Defendant is correct that indeed, the tragedy has evoked a veritable "tidal wave" of passions (Def. Mem. Law at 6), and while New York residents are particularly hard hit because of the destruction of the World Trade Center and considerable loss of loved ones, the tidal wave is of national, not just local, proportions. As the Defense's own consultant acknowledges, the Survey "cannot provide strong evidence on the linkage between the special prejudice in New York arising from the events of September 11 and the fair trial rights of the defendant." Aff. ¶ 21.

On these very specific facts, this Court is unwilling to find that there exists the rare circumstance of so great a prejudice in one of the largest and most racially, ethnically, and culturally diverse districts in the country that the Court simply could not believe, as a matter of law, the answers of jurors as to their ability to be impartial. As discussed *supra*, a careful and searching voir dire and expanded jury pool are remedies used routinely in high-profile cases and are appropriate here.[7]

### B. Exclusion of Photographs

As the Government's responsive papers make clear, its intent is to intro-

---

5. The Government's argument that Question 10 was fatally flawed in that it did not ask the respondent's personal feelings of prejudice towards Arabs is unpersuasive, since, as Professor Bronson makes clear, professional standards dictate that the questions be worded as they were. *See* Def. Mem. Law at Ex. B.

6. Indeed, Professor Bronson expressed surprise at the relatively small difference and attributes it to the fact that the district in Florida ranked even higher than New York in the percentage of respondents who cited a

difficulty for members in their respective communities to be fair. *See* Aff. ¶ 20.

7. Indeed, much of Professor Bronson's Report is devoted to the recommendation of protective voir dire procedures this Court has traditionally utilized in the past: a comprehensive jury questionnaire, an expanded jury pool, individualized voir dire when indicated for the "for cause" portion of the examination, and attorney input on the content of the voir dire.

duce only one of three photos depicting Mr. Pepe on his back on a MCC health services stretcher with his forehead bandaged with gauze. Accordingly, Defendant's motion to prohibit the Government from offering more than one of these photos as needlessly cumulative has been mooted. What remains for the Court's decision is whether the close-up photograph of Mr. Pepe's bandaged and bloody face, taken shortly after the surgery to remove the comb, should be excluded as more prejudicial than probative under Rule 403.

Federal Rule of Evidence 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, ... or by considerations of ... needless presentation of cumulative evidence." The Advisory Committee Notes to Rule 403 define "undue prejudice" as an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." The Notes are in accord with major treatises on the topic by elaborating that "the availability of other means of proof may also be an appropriate factor" for consideration in the balancing test. *See* Fed.R.Evid. 403, Adv. Comm. Notes; *see, e.g.*, 22 Charles A. Wright & Kenneth Graham, Jr., *Federal Practice and Procedure*, § 5214 (1978 ed.)("The prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence.").

Photographs depicting the bloody victim in a trial have routinely been the subject of Rule 403 objections, and the Second Circuit has made clear that the graphic or disturbing nature of a photograph alone is not enough to render it inadmissible. *See United States v. Velazquez*, 246 F.3d 204, 210–211 (2d Cir.2001). Rather, the analysis hinges upon whether the photograph is relevant to the resolution of some disputed point in a trial or otherwise aids a jury in a factual determination. *Id.; see also United States v. Lopez*, 271 F.3d 472, 482 (3d Cir.2001)(affirming admission of photographs depicting victim's injury where charge required proving element of "serious disfigurement by mutilation"); *United States v. Allen*, 247 F.3d 741, 793 (8th Cir.), *petition for cert. filed*, No. 01–7310 (U.S. Oct. 22, 2001)(affirming admission of autopsy photographs showing entry angles of the bullets, locations of each wound, and extent of injuries caused as important aid to jury in determining relative positions of victim and shooters as each shot was fired, which was key issue during trial directly impacting on defendant's culpability); *United States v. Salameh*, 152 F.3d 88, 122–23 (2d Cir.1998)(affirming admission of "disturbing" photographs depicting victims killed in World Trade Center bombing because "they were probative of the nature and location of the explosion that killed the victims, which the defendants disputed at trial."); *U.S. v. Ingle*, 157 F.3d 1147 (8th Cir.1998)(affirming admission of crime scene and autopsy photographs where photos were admitted not only to show how victim died, but also to corroborate witness testimony, to demonstrate extent of defendant's knowledge of details of the crime, and to assist jury in understanding medical examiner's testimony); *United States v. Eyster*, 948 F.2d 1196, 1212 (11th Cir.1991)(citing prejudice in the inclusion of a "disturbing" photograph of a smuggler's body where "the manner of death of the body was not an issue for the jury to resolve.").

Accordingly, the resolution of this issue hinges first upon a determination of the probative value of this photograph to any issue at dispute in trial. Defendant argues that the post-operative photograph "does not tend to prove any contested issue in this case. Mr. Pepe's regrettable condition

after his operation on November 1, 2000 is totally irrelevant to the issues in this trial." Def. Mem. Law at 5. Defendant further argues the photograph's irrelevance given the existence of other testimonial, photographic, and CAT scan photos showing that Mr. Pepe had a comb thrust into his eye which entered more than two inches into his brain and that the comb was removed by drilling into his skull and reflecting a portion of his scalp. *See id.* The Government responds that the challenged photograph: "shows the nature, extent, and severity of Officer Pepe's injuries. It shows, in addition to the knife wound where Officer Pepe's left eye once was, a right eye that is swollen shut, bruises on his face, and blood in his nostrils and mouth. It shows that Officer Pepe was beaten as well as stabbed . . . The extensive and severe injuries depicted in the photo also prove that the stabbing was not an accident, a defense [raised by Salim]." Govt. Mem. Law at 20.

The Government is correct in its assessment that the depiction of the nature and extent of a victim's injuries can certainly be relevant and probative of intent, particularly where the Defendant places intent in dispute at trial. *See, e.g., Allen,* 247 F.3d at 793 ("The [autopsy] photographs were also probative of intent—another aspect of each defendant's culpability—by showing the extent of damage caused by the choice of using hollow point ammunition during the robbery.") Had this close-up photograph of Mr. Pepe's face been taken after the attack but before the invasive surgical procedure at Belleview, this Court would agree that such a photograph could have been probative of intent. The difficulty arises where the photograph is post-operative and does not necessarily reflect the state of Mr. Pepe's face after the attack, but after invasive surgery was performed (including drilling into his skull) to save Mr. Pepe's life. Thus, its evidentiary value for the purpose cited by the Government—to show that Pepe was beaten as well as stabbed—is diminished by the presence of possible post-operative trauma. *See* Fed.R.Evid. 403 (citing confusion of issues or misleading the jury as appropriate factors for consideration).

Accordingly, given the disturbing nature of the close-up photograph of Mr. Pepe's bloodied and lacerated face combined with the potential for confusing the issues or misleading the jury, this Court finds that it should be excluded as more prejudicial than probative under Federal Rule of Evidence 403. Should the Government be able to show to the satisfaction of the Court that the photograph is an accurate rendition of Mr. Pepe's injuries from the alleged beating and stabbing alone and not also the necessary result of post-operative trauma, this Court will revisit the issue of this photograph's admissibility.

## C. Testimony of Government's Fingerprint Expert

█ In the challenge to the Government's proposed expert testimony regarding fingerprint identification, Defendant relies exclusively on *United States v. Plaza,* 2002 WL 27305 (E.D.Pa. Jan.7, 2002), which precluded expert testimony that a defendant's fingerprints matched latent fingerprints pursuant to the standard established in Federal Rule of Evidence 702.

The 1993 *Daubert* ruling of the U.S. Supreme Court charges trial judges with the responsibility of acting as "gatekeepers," where specifically, the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 597, 113 S.Ct. 2786, 125 L.Ed.2d

469 (1993). In particular, Fed.R.Evid. 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The threshold inquiry is one of relevance, in that the court must be satisfied that the proffered scientific expert testimony "is sufficiently tied to the facts" in order to assist the trier of fact to understand the evidence or to determine a fact in issue. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)(discussing so called "fit" or "helpfulness" requirement).

In addition, the underlying scientific methodology utilized by the expert must be assessed through a specific, multi-factored inquiry into its reliability: (1) whether the expert's technique or theory has been tested; (2) whether it has been subjected to peer review; (3) its potential rate of error; (4) the existence or maintenance of standards and controls; and (5) whether it has gained general acceptance in the relevant scientific community. *See Kumho,* 526 U.S. at 149–50, 119 S.Ct. 1167; *Daubert,* 509 U.S. at 593–4, 113 S.Ct. 2786; *see also United States v. Kwong,* 69 F.3d 663, 668 (2d Cir.1995)(holding *Daubert* standard requires that "the proffered scientific evidence is both relevant and reliable").

The Government's proposed expert witness is a latent fingerprint examiner who has been employed as a Fingerprint Specialist at the Federal Bureau of Investigation for the last twenty years. *See* Govt. Mem. Law at 24–27. He is expected to testify that he identified Defendant's fingerprints on certain documents found in Defendant's cell at the MCC following the attack on November 1, 2000. *See id.* The expert attests that he utilized the FBI's methodology to conduct the fingerprint examinations in this case. *See id.* (describing methodology).

The relevance, or fit, of the fingerprint identification to disputed issues at trial is beyond doubt, so the Court is left to determine whether the proposed expert testimony on fingerprint identification satisfies the reliability inquiry under *Daubert* and its progeny. It is without question that fingerprint analysis has enjoyed a long history of acceptance as a scientifically sound technique for identification and has routinely been admitted as such for the purposes of criminal trials. *See, e.g., United States v. Havvard,* 260 F.3d 597 (7th Cir.2001)(rejecting Defendant's contention that fingerprint analysis utilizing same FBI methodology is not scientific and is thus unreliable); *United States v. Salameh,* 152 F.3d 88, 128–9 (2d Cir.1998)(stating in dicta that identification of fingerprints rested on well-settled scientific foundation); *United States v. Sherwood,* 98 F.3d 402, 408 (9th Cir.1996)(asserting that the reliability of fingerprint comparisons cannot be questioned).

The *Plaza* Court, after a detailed and in-depth analysis of the basic premises of fingerprint identification, appeared to have been troubled by what it repeatedly referred to as a high degree of subjectivity in the evaluation stage: "it is difficult to see how fingerprint identification—the matching of a latent print to a known fingerprint—is controlled by any clearly describable set of standards to which most examiners subscribe." *Plaza,* 179

F.Supp.2d at 514. Accordingly, the Plaza Court allowed the presentation of testimony as to the entirety of the fingerprint identification process, with the exception of "evaluation testimony", i.e., that a particular latent print is in fact the print of a particular person. *See id.* at 516.

This Court is unpersuaded by such reasoning, for it hearkens to an imprudently stringent understanding of scientific objectivity. Contrary to the *Plaza* reasoning, the mere fact that an expert utilizes his or her expertise and training to determine whether there is enough agreement of the various print ridge formations to be able to individualize and ultimately, to "match" a print, does not constitute an absence of standards to render the technique unreliable. Rather, the methods of comparison are in fact testable such that both parties can subject prints to verification. The appropriate attack of an expert's "match" opinion is in rigorous cross-examination and the presentation of other experts to challenge the findings, not the whole-sale preclusion of a reliable methodology. *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attaching shaky but admissible evidence."). Indeed, such reasoning could function to render numerous categories of expert evidence, such as psychiatric or medical forensic evidence which rest in some part upon that individual's skill and experience in analyzing data, unreliable. *Daubert* and its progeny simply do not mandate such a conclusion.

This Court finds that the methodology undertaken by the Government's expert (as described in Govt. Mem. Law at 24–27)

meets the *Daubert* standard for reliability as the generally-accepted technique for testing fingerprints and that fingerprint comparison has been subjected to peer review and publication.[8]

### III. CONCLUSION

Accordingly, for the aforementioned reasons, Defendant's motions for a change of venue and to preclude testimony from an FBI fingerprint expert is DENIED. Defendant's motion to preclude a post-operative photograph of Officer Pepe's face is GRANTED at this time.

Parties are to submit any additional voir dire questions to Chambers by 4:00 PM March 27, 2002.

SO ORDERED.

---

8. Defendant lodges no objection that the Government expert's methodology deviated from the FBI methodology.