OPINION OF THE COURT
Joseph J. Maltese, J.
Facts
The pro se claimant put forth a credible case in this matter and many of the facts are undisputed. On June 29, 1994, George H. Pickersgill entered the basement of his house at 183 Hart Boulevard, Staten Island, New York, to find two feet of water. He discovered that the water had backed up into his basement from the sewer trap in his basement. As a result of the sewer backup, the claimant sustained irreparable damage to his 27-year-old furnace (steam boiler) and some damage to food being kept in his basement. He called the New York City Department of Environmental Protection (DEP), who came to his home and opened the sewer. He claims the water then "rushed out” of the basement and into the sewer. It is undisputed that the water came from a sewer which is owned, operated and maintained by DEP, an agency of the City of New York. A timely notice of claim and subsequent lawsuit were filed against the City of New York.
1. Liability
The attorney for the City of New York claims this was an Act of God, due to heavy rainfall, for which the city is not responsible. An injury is caused by an Act of God: "when it happens by direct, immediate and exclusive operation of the forces of nature, uncontrolled or uninfluenced by the power of man and without human intervention, and is of such character that it could not have been prevented or escaped from by any amount of foresight or prudence, or by any reasonable degree of care or diligence.” (Resnick Co. v Nippon Yusen Kaisha, 39 Misc 2d 513, 514 [Civ Ct, NY County 1963].) While it may be argued that rain is an Act of God, that alone will be insufficient to relieve the city of its duty to maintain adequate sewers foreseeing the likelihood of a heavy rainfall (Christman v State of New York, 189 Misc 383 [Ct Cl 1947]). In order to invoke the Act of God theory of defense the city must establish that the weather conditions were so extraordinarily harsh as *770 to not be anticipated by reasonable design engineers of the sewers. Hence, where the negligent acts (or omissions) of the defendant contribute to the injury sustained, the Act of God defense should not be applied (Greeley v State of New York, 94 App Div 605 [3d Dept 1904].)
Additionally, the city’s attorney argues that the city is not responsible when sewers back up into the homes of the individuals who use those sewers, citing the case of Beck v City of New York (23 Misc 2d 1036 [Sup Ct, Queens County 1960], affd 16 AD2d 809 [2d Dept 1962]). The Beck decision held that "a municipality cannot be held liable for its failure to provide a drainage system sufficient to dispose of surface waters flowing as a result of the natural drainage, the grading and paving of streets” (supra, at 1041). Beck further states that a municipality could be found liable if after determining a drainage plan it is either negligent in its construction or its care and maintenance so as to constitute a nuisance (supra, at 1040, 1043). However, this is clearly not the facts presented to this court.
The city is required to use reasonable care to inspect and repair the sewers so as to prevent damage to its citizens’ property. Where it fails to do this and the sewer becomes obstructed the city can be liable for the damages resulting from their acts or omissions (Talcott v City of New York, 58 App Div 514 [1st Dept 1901]). In the case of Talcott (supra), an obstruction in the city’s sewers caused a sewer backup into the basement of the plaintiff. Justice Ingraham held that: "[t]he sewer was capable of doing the work that was required of it; that is, to carry off all of the sewerage flowing into it from the houses with which it was connected, and a failure to maintain the sewer in this condition would be negligence for which the defendant would be responsible. The principle upon which such a liability has been imposed was stated by Chief Judge Nelson in Mayor v. Furze (3 Hill, 615) as follows: 'If, therefore, we concede that the exercise of the power was, in the first instance, optional on the part of the [city], yet, having elected to act under it, [it] must be held responsible for a complete and perfect execution * * * The owners and occupants of houses and lots in the neighborhood having been charged with the expense of the sewers, acquired a right to the common use of them; and a corresponding duty developed upon the [city] to keep them in proper condition and repair.’ ” (Supra, at 516-517.)
Also analogous of the issue before this court is a Court of Appeals decision dealing with breaks in a city-owned water main. *771 In George Foltis, Inc. v City of New York (287 NY 108 [1941]), a broken city-owned water main was damaged causing a flooding of the plaintiff’s restaurant in Manhattan. The Court of Appeals stated that it "agree[d] that under the rule of res ipso loquitur the plaintiff’s proof that its property was damaged by a break in a water main constructed and controlled by the city was sufficient to establish prima facie that the injury was due to negligence of the city” (supra, at 118). After this prima facie case is established by the plaintiff it is then up to the trier of fact to determine "whether an inference of negligence should be drawn” (supra, at 119).
The standard in New York to establish a permissible inference of negligence based on res ipso loquitur is warranted when the plaintiff establishes the following three elements: (1) the event must be of a kind which ordinarily does not occur in the absence of someone’s negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff. (See, Ebanks v New York City Tr. Auth., 70 NY2d 621, 623 [1987].) Once the above elements are established by a preponderance of the evidence then the trier of fact "may infer that the defendant was negligent” (PJI 2:65 [1996 Supp]).
In another water main break case the Court of Appeals held that:
"[w]hen the exact cause of injury is unknown the doctrine of res ipso loquitur permits the [trier of fact] to infer negligence if the injury is the type which does not ordinarily occur without the neglect of some duty owed to the plaintiff and the defendant is in exclusive * * * control of the instrumentality * * *
"The theory is that water mains do not ordinarily break if they are properly installed and maintained, and that any break in the main was probably caused by the owner’s neglect of its duty, since the owner is generally in exclusive possession and control * * * In such a case it is unnecessary to prove the exact cause of injury in order to hold the owner liable since the circumstances show that the owner 'is responsible for all reasonably probable causes to which the event can be attributed’ ” (De Witt Prop. v City of New York, 44 NY2d 417, 426 [1978], quoting Restatement [Second] of Torts § 328D, comment gi-
ll] This court finds that the backup of the sewer into a home is not an event which normally occurs absent some negligence on the part of the municipality charged with operating and *772 maintaining the sewer system. It is also a fact that the city through its agent the DEP is in exclusive control of the sewer system in New York. A homeowner cannot fix, alter or make changes to the sewer lines, inlets or outlets which are on his or her property without authorization from the city. This court also finds that Mr. Pickersgill did not in any way cause this sewer backup to occur. Accordingly, this court concludes under the doctrine of res ipso loquitur that there is an inference of negligence.
2. Damages
At the damage portion of the trial, the plaintiff stated that his old furnace could not be replaced since parts were no longer available to repair it. As a result the plaintiff was "forced” to purchase a new furnace at a cost of $2,850 for which he submitted a paid invoice. The plaintiff was able to have the hot water heater repaired at a cost of $70.36. Additionally, the plaintiff states that food being kept in the basement was destroyed in the flood which had a value of $54.53, receipts for which were previously tendered to the defendant. Mr. Pickers-gill states that he should recover the full cost of replacement of the furnace which was destroyed as a result of the flooding. He contends that he did not need a new boiler and that the old boiler was working fine. Therefore, he claims, in essence, that he should recover the full replacement cost of the new furnace, not the value of his old furnace.
To support his proposition that the old furnace was just as good as the new furnace the plaintiff introduced into evidence his gas bills from October of 1993 through June of 1994 (when the old furnace was replaced) and the comparative October of 1994 through June of 1995 bills. However, an examination of the gas bills demonstrates that the new furnace resulted in 23.6% monetary savings after the new furnace was installed.[1]
The City states that the court must award, if anything, the value of the old furnace and contends that since the plaintiff *773 did not call an expert to testify as to the value of the old furnace this court is not capable of awarding any damages to the plaintiff. This court finds such an argument to be without merit and believes that it is capable of evaluating the damages caused the plaintiff without additional expert testimony.
Courts have long since acknowledged that awarding a plaintiff the fair market value of an item lost or destroyed is not always feasible or just. The Court of Appeals in Lake v Dye (232 NY 209, 214 [1921]) held that: "[w]earing apparel in use and household goods [including a gas range, mattress and cabinets] and effects owned and kept for personal use, are articles which cannot in any fair sense be said to be marketable, and have a market value, or at least a market value which is fairly indicative of their real value to their owner and of his loss by being deprived of them * * * [T]he amount of recovery ought not to be restricted to the price which could be realized by a sale in the market. The owner should be allowed to recover the value to him based on his actual money loss, all the circumstances and the conditions considered, resulting from his being deprived of the property.” [2]
The furnace which was already installed when the plaintiff bought the house 27 years ago is at least that old. Therefore, the plaintiff could not testify as to its original cost or its exact age. The plaintiff testified that the old furnace was in good condition and was working fine. Additionally, he testified that the furnace was checked regularly and that he was having no problems with it. The plaintiff also testified that the old furnace could not be repaired since parts needed were no longer available. To the plaintiff he had a working furnace and did not anticipate buying a new furnace until he was forced to do so as a result of the sewer backup. He now wants to be in the same position he was in before the flood. If the plaintiff was suing for the value of the old furnace then this court would have had difficulty determining the value of same due to the lack of information presented as to the value of the old furnace. *774 However, here the plaintiff is suing for the replacement cost of a new furnace. Arguably locating and installing a used furnace of similar type and vintage was impractical.
However, while it is not always true that new is better than old, this court finds that the fuel bills demonstrate that the new furnace is more efficient and more economical to operate. This is a benefit to the plaintiff which this court cannot ignore. Accordingly, this court holds that the plaintiff is entitled to $1,425 towards the cost of replacing the old furnace plus $70.36 for the cost of repairing the hot water heater and $54.53 for the value of the food lost.
Accordingly, judgment shall be entered for the plaintiff in the amount of $1,549.89 plus costs of suit.

. From October 1993 to June 1994 the plaintiff was billed $1,383.53 (excluding taxes) and used 1379 thermal units (therms). His average monthly cost for this period was $276.71. From October 1994 to June 1995 the plaintiff was billed $1,119.20 (excluding taxes) and used 1124 therms. His average monthly cost for this period was $223.84. The plaintiff used 22.6% less therms which resulted in a savings of $264.33 for the five-month period, which was a 23.6% savings in the amount he was billed in the prior year with the old furnace. However, it should be noted that the average temperature for the 1994-1995 period was two degrees warmer and the cost of gas was increased slightly from the prior year, which may partially account for the savings in the gas bills.

. Additionally, the Pattern Jury Instructions (PJI 2:312 [1996 Supp]) list certain factors which should be taken into account in determining the value of the object to the plaintiff: (1) the original cost of such property when new; (2) the price paid for it by the plaintiff and its age at the time of purchase; (3) the value of the materials and labor used in producing it; (4) its utility; (5) the use it has received and its age at the time of the loss; (6) the extent of its deterioration or depreciation, if any; (7) its general condition at the time of its loss; (8) whether it could be repaired or replaced and, if so, the expense of repairing or replacing it; (9) the item’s value as so repaired or replaced as compared to the value before its loss.