Robert A. FALISE; Louis Klein, Jr.; Frank Macchiarola; and Christian E. Markety, Jr. as Trustees, Plaintiffs,

v.

The AMERICAN TOBACCO COMPANY; R.J. Reynolds Tobacco Company; B.A.T. Industries, PLC; Brown & Williamson Tobacco Corporation; Philip Morris Incorporated; Liggett Group, Inc.; and Lorillard Tobacco Company, Defendants.

No. CV99–7392.

United States District Court, E.D. New York.

July 28, 2000.

James L. Stengel, Orrick, Herrington & Sutcliffe LLP, New York, NY, Steven Kazan, Kazan, McClain, Edises, Simon & Abrams, Oakland, CA, for plaintiffs.

Marjorie Press Lindblom, Kirkland & Ellis, New York, NY, Daryl Langdon Joseffer, Kirkland & Ellis, Washington, DC, for American Tobacco Co., defendant.

Harold Keith Gordon, Jones, Day, Reavis & Pogue, New York, NY, Alan Mansfield, Greenberg Traurig, New York, NY, Keith W. Vaughan, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Winston–Salem, NC, Kelly Amanda Lee, Jonathon Andrew Fligg, Womble Carlyle Sandridge & Rice, PLLC, Atlanta, GA, Marilyn R. Forbes, Womble Carlyle Sandridge & Rice, Raleigh, NC, for R.J. Reynolds Tobacco Co., defendant.

Joseph M. McLaughlin, Simpson, Thacher & Bartlett, New York, NY, for B.A.T. Industries P.L.C., defendant.

Michelle H. Browdy, Robert F. Huff, Jr., Elli Leibenstein, Douglas G. Smith, Kirkland & Ellis, Chicago, IL, Marjorie Press Lindblom, Steven M. McCormick, Kirkland & Ellis, Chicago, IL, James E. Milliman, Middleton & Reutlinger, Louisville, KY, for Brown & Williamson Tobacco Corp., defendant.

Terence J. Sexton, Andrew D. Carpenter, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, Charles B. Molster, III, Winston & Strawn, Washington, DC, Jeffrey M. Wagner, Dan K. Webb, Joseph P. Franklin, Ricardo E. Ugarte, Winston & Strawn, Chicago, IL, for Philip Morris Inc., defendant.

Nancy E. Struab, Kosowitz Benson Torres & Friedman LLP, New York, NY, for Liggett Group, Inc., defendant.

Terence J. Sexton, Andrew D. Carpenter, Karen A. Read, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, Alan Mans-

field, Greenberg Traurig, New York, NY, for Lorillard Tobacco Co., defendant.

## PRELIMINARY MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

Continuing the court's decisions on in limine motions reflected in orders dated July 18, 19, and 25, the parties' first *Daubert* motions are now addressed:

### Expert Witnesses Challenged

There have been a number of challenges to the testimony of the following experts proposed as witnesses in the forthcoming trial:

1. Dr. Jeffrey Harris will appear for plaintiffs to testify on the relationship between Tobacco conduct and Trust claimant smoking patterns, disease causation and resulting injury to claimants. Dr. Harris's proposed model purports to demonstrate that those exposed to asbestos would have quit smoking earlier if they had not been mislead by Tobacco's fraud, thus leading to less serious diseases to be compensated by the Trust.

2. Dr. Thomas Florence is proffered by plaintiffs to forecast future claims. He has been unable to appear at a required evidentiary hearing. The *Daubert* hearing on this witness is postponed. The parties will arrange promptly with the case coordinator, Ms. June Lowe, for an evidentiary *Daubert* hearing or submit the issue on papers.

3. Professor Jon D. Hanson is a proposed witness for plaintiffs to discuss the impact of Tobacco conduct, particularly advertising, on smoking patterns and consumer behavior. A prima facie demonstration of compliance with Rule 702 of the Federal Rules of Evidence has been established by copies of his articles now on file. If the parties wish an evidentiary *Daubert* hearing on this witness they should arrange for one promptly with the case coordinator.

4. Professor Peter Schuck's testimony was offered by defendants on the following: the impact of Trust settlement policies and practices; the Trust's inability to demonstrate that any of the dollars paid by the Trust historically were due to conduct of the Tobacco industry; and the impact of mass tort dynamics on Trust settlement decisions, negotiation of the Trust Distribution Process agreement (TDP) and dollars ultimately paid.

5. Dr. Frederick Dunbar is to appear for defendants to rebut Dr. Harris's testimony by arguing that Trust cost-benefit calculations in settling claims, not decisions anchored in tort law, explain Trust payments. He has also provided a model demonstrating that even had the Tobacco industry not mislead Trust claimants, the amounts payable by the Trust would have been the same.

6. Professor Karen Gross has offered to testify for defendants on the impact of Johns–Manville's plan of reorganization, and on policies adopted by the Trust for settlement of asbestos claims and dollars paid by the Trust over time.

7. Professor William O'Connell's testimony is proposed by defendants on the Trust's operation and its impact on dollars expended.

Each of these experts is highly qualified in his or her field.

For the reasons stated orally on the record, the testimony of the following appear to be unnecessary and are excluded pursuant to the court's general authority to control the trial and on the assumption that the documents they would have relied on can be utilized in arguments by counsel: Professor Peter Schuck, Professor Karen Gross, and Professor William O'Connell. No *Daubert* decisions as to these three experts are required. During the course

of trial, the parties may request the court to reconsider its decision.

### Criteria for Exercising Court's Daubert Role

The trial court is not called upon to analyze in great detail the proposed testimony of an expert as part of the *Daubert* hearing—although at times it may be useful to do so as in connection with problems of proving general causation in the first cases on the subject of harm caused by a pharmaceutical product. Requiring a detailed analysis for such *in limine* matters tends to slow down the litigation and make it more burdensome to the parties and the courts. While, unlike the jury, the court is expected to give reasons for its decisions, particularly after trial, a brief summary is all that is required under Rules 104 and 702 of the Federal Rules of Evidence for these *Daubert* hearings.

### Daubert Analysis for Doctors Harris and Dunbar

Full evidentiary hearings were held with respect to Dr. Harris and Dr. Dunbar. Both are by education and experience fully qualified in the fields they propose to address. Both are well recognized with extensive reliable peer reviewed publications and prior court testimony. Both propose to submit statistical models based upon their own research, recognized research of others, peer reviewed publications, and information properly relied upon by experts such as themselves for similar purposes.

The court evaluates Dr. Harris's and Dr. Dunbar's testimony, and their respective underlying models, for gatekeeping purposes under Rule 702 of the Federal Rules of Evidence as amended effective December 1, 2000. *See also, e.g., Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The amended rule reads as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

Fed.R.Evid. 702 (as amended Dec. 1, 2000) (amended text emphasized). The admissibility of expert testimony is predicated upon convincing the court pursuant to Rule 104(a) that the proponent has established scientific reliability by a preponderance of the evidence.

The specific *Daubert* criteria identified by the Supreme Court have been considered and the court has found these factors established for both Dr. Harris and Dr. Dunbar. As summarized by the Advisory Committee Note to the amended Rule, these factors are:

(1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error for the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

Fed.R.Evid. 702, Note (effective Dec 1, 2000). Other criteria utilized by the courts, as synthesized by the Advisory Committee in support of the 2000 Amendment, are helpful and are satisfied.

Both Dr. Harris and Dr. Dunbar propose to testify about matters growing naturally and directly out of research they

have conducted independently for this litigation. Each expert has been as vigorous, as careful, and as thorough in his work as he would have been for his other scientific work designed for peer review outside his paid litigation consultation in this case.

Each expert in his field of expertise has demonstrated reliable results and has adequately accounted for alternative explanations of his data. The statistical modeling techniques used were well designed and appropriately executed by these two experts.

Their proposed testimony is reliable. It will be presented with the assistance of charts and other visual devices that will enable the jury to understand the testimony, to evaluate the credibility of the experts, and to determine the probative force of their models. The principles and methodology used are capable of evaluation by a lay jury.

Although each expert has justifiably extrapolated from established premises to well founded conclusions, Dr. Dunbar has not provided a sufficiently secure base to extrapolate to future claimant's primary cancers of the lungs and other diseases attributable to defendants' conduct. His model may only be used to estimate the effect of Tobacco's conduct on numbers of claimants for the period before September 1, 2000. Other evidence and argument of counsel may permit future projections. The periods for which damages are permitted has been explained to counsel orally and in writing.

The Trust appealed from Magistrate Judge Gold's ruling that the "new" Mt. Sinai data was untimely and that Dr. Harris could not testify about it at trial. Dr. Harris did rely on this data at the *Daubert* hearing and was subject to cross–examination with respect to it. Since the court of appeals for the Second Circuit has now stayed the trial beyond the date the magistrate judge assumed trial would commence (based on the trial court's setting of the trial date for July 5, 2000), there is now no prejudice to the parties in reversing the magistrate judge's exclusionary ruling. It is revered. Dr. Harris and other experts for both sides may utilize this "new" data in their trial testimony.

Dr. Harris is not qualified to calculate the actual dollar costs to the Trust of compensating claimants and may therefore not convert his findings to monetary sums. This computation will be left to other evidence and to arguments of counsel.

### Limits on Daubert Findings

Sampling and statistics-based modeling and other methods of analyzing large numbers of claims that were utilized by these experts are appropriate in mass litigation. *See, e.g.,* Laurens Walker & John Monahan, *Sampling Liability,* 85 Va. L.Rev. 329 (1999); *cf. Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir.1996) (statistical sample of class claims); David H. Kaye & David A. Freedman, *Reference Guide on Statistics in Reference Manual on Scientific Evidence* 83 ff (2d ed.2000); Laurie Strauch Dix, *Preclusion of Legal Expert Witnesses, in ALI–ABA Materials on New Directions in Expert Evidence,* 123 (May 4, 2000).

Creating statistical models of the kind at issue here depend upon judgment and art as well as the reasoned manipulation of numbers. Models are not the real world; rather, such models are a reasoned and educated attempt to describe reality by accepted methods of statistical analysis using available real world observations, data, and knowledge. The process is not like a Pythagorean demonstration of a mathematical truth that can be revealed indisputably. Neither is it simple "numbers crunching."

Statistics, broadly defined, is the science and art of gaining information from data. Statistical inference—whether done with confidence intervals or significance probabilities, by objective methods or subjective—depends on the validity of the statistical models for the data. If the data are collected on the basis of a

probability sample or a randomized experiment, there will be statistical models that fit the situation very well, and inferences based on these models will be quite secure. Otherwise, calculations are generally based on analogy: this group of people is like a random sample, that observational study is like a randomized experiment. The fit between the statistical model and the data may then require examination: how good is the analogy?"

*Reference Guide on Statistics, supra* at 85; *see generally* Stephen E. Fienberg, *The Evolving Role of Statistical Assessments as Evidence in the Courts* 192 (1989) ("Statistical analysis and inferences are . . . designed to inform judgments about the issue that generated the statistical inquiry"); Hans Zeisel & David Kaye, *Prove It with Figures: Empirical methods in Law and Litigation* vii (1997), ( "candor in recognizing the limits of statistical and scientific knowledge"); Lincoln E Moses, *The Reasoning of Statistical Inference, in Perspectives on Contemporary Statistics* 107, 117–118 (David C. Hoaglin & David S. Moore eds., 1992) ("[A] given data set can be viewed from more than one perspective, can be represented by a model in more than one way. Quite commonly, no unique model stands out as 'true' or correct; justifying so strong a conclusion might require a depth of knowledge that is simply lacking. So it is not unusual for a given data set to be analyzed in several apparently reasonable ways."); George Johnson, *Strange Beauty, Murray Gell–Mann and the Revolution in Twentieth–Century Physics* 67 (2000) ("[T]he great physicist Paul Ehrenfest had urged. . .not to be overly impressed with fancy mathematics. . . . It was dangerously easy to get carried away playing with numbers and forget that the object of the game was to talk about the real world.").

Too nitpicking an approach to find reasons to exclude expert testimony from distinguished scientists will tend to drive the best of them out of the courtroom. The greatest danger to the courts is not the incompetent who will testify for pay, but our failure to encourage sound scientists to assist the law. *Cf. e.g.,* Stephen Breyer, *Science in the Courtroom, in Issues in Science and the Courtroom* (Summer 2000) ("[T]he law must seek decisions that fall within the boundaries of scientifically sound knowledge").

Experts other than Doctors Harris and Dunbar might well reach different conclusions from theirs. Reasonable differences in scientific evaluation are not a basis for exclusion. These two experts did apply properly well-known scientific principles to obtain the results and opinions they propose to describe to the jury. No step of their analysis is unreliable. Having observed them at length at the *Daubert* hearing under intensive cross-examination by counsel, it seems apparent to the court that they will testify in a good-faith belief that their results are correct.

The results of a court's *Daubert* inquiries in cases involving statistical modeling need not be precisely quantifiable in a way all experts would unanimously agree upon. Here for instance, the different experiences of the two experts accounts in part for their differing results. Nevertheless, their divergent conclusions are based on sufficient reliable underlying facts and data, and sufficiently rigorous and accepted statistical methods to warrant submission to the jury. *See* Fed.R.Evid. 703.

### Conclusion

In summary, both Dr. Harris and Dr. Dunbar will be permitted to testify based on scientific and other specialized knowledge in a way that will assist the trier of fact to understand the evidence and to determine the facts in issue. Both are qualified as experts by virtue of their knowledge, skill, experience, training and education to testify in the form of the opinions they are prepared to give. Their proposed testimony is based upon sufficient reliable facts and data, and it is the product of reliable and well accepted scientific principles and methods. They have

appropriately applied reasonable scientific principles and methods reliably to the facts of the case.

With the limitations described above, and those provided in oral instructions on the record to counsel, the *Daubert* motions are granted in part and denied in part.

Counsel shall arrange any other required *Daubert* hearing as soon as practicable.

SO ORDERED.