Jory LESSER, a minor, by his parents and natural guardians, David LESSER and Diane Lesser, and David Lesser and Diane Lesser, individually, Plaintiffs,

v.

CAMP WILDWOOD, Mark Meyer, Peter Meyer, and the Meyers Partnership, Defendants.

No. 01 Civ.4209 RWS.

United States District Court, S.D. New York.

Sept. 16, 2003.

Shafran & Mosley by Kevin L. Mosley, New York City, for Plaintiffs.

Traub Eglin Lieberman Straus by Stephen D. Straus, Gerard Benvenuto, Hawthorne, NY, for Defendants.

## OPINION

SWEET, District Judge.

The defendants Camp Wildwood, Mark Meyer, Peter Meyer and the Meyers Partnership, have made two motions: (1) to preclude the use at trial of evidence, including opinions and testimony, from plaintiffs' retained experts on the grounds that the opinions and conclusions do not meet the standards of reliability imposed by *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and related cases; and (2) for partial summary judgment on plaintiffs' claims for negligent supervision and for premises liability.

For the reasons set forth below, the motion to preclude the use of evidence is denied in part and granted in part, and the motion for partial summary judgment is denied.

## Prior Proceedings

The Lessers commenced this action on April 10, 2001 in New York State court. On May 16, 2001, the action was removed to the United States District Court, Southern District of New York on the basis of diversity jurisdiction. Discovery was concluded on May 14, 2003.

The motion by defendants to preclude the testimony of plaintiffs' experts was submitted in conjunction with defendants' motion for partial summary judgment on plaintiffs' negligent supervision and premises liability claims. Both motions were filed on June 4, 2003. After submission of briefs, the motions were considered fully submitted on July 9, 2003.

## Facts

The following facts are taken from the parties' Rule 56.1 statements and, as required, are construed in the light most favorable to the non-movant, as applicable. They do not constitute findings of fact by the Court.

In the summer of 2000, plaintiff Jory Lesser, then 12 years old, was a camper at Camp Wildwood, a summer camp in Bridgton, Maine owned and managed by the defendants. On July 4, 2000, Jory Lesser was injured at the camp when a pine tree fell on him during a thunderstorm which arose after the start of a fireworks display on the waterfront of the camp.

Each summer, the camp services approximately 200 boys ranging from eight to fifteen years of age. The boys are divided by age into groups and housed with their peers in cabins.

The camp is an accredited member of the American Camping Association, ("ACA"), a private non-profit organization that promulgates standards for camps throughout the United States. The camp is also licensed by the state of Maine. Pursuant to state licensing requirements and the ACA accreditation process the camp is subject to inspection by both entities.

In connection with their ACA accreditation requirements, the camp is required to have procedures in place for emergency situations. With respect to dangers posed by severe weather conditions, the camp had the following protocol:

### Severe Storm

In the case of anticipated high winds, heavy rain or electrical storm, the camp will be notified of storm warnings by the Bridgton Police Department.

The campers and staff are brought to upper camp (away from the waterfront and densely treed areas) and placed along the walls of the Gym for safety until the storm has passed and Head of Maintenance and Admin have had an opportunity to walk the grounds and identify the hazards and damage. (Naturally, if the Police Chief believes the impending storm warrants evacuation to a prepared area, that will be our response.)

### Unexpected Storms

Storms sometimes build with amazing speed and can slam into Wildwood from the lake with little or no warning.

In this event, everyone will be evacuated from the waterfront and lower camp immediately. Counselors will escort all campers to the gym where a count will be taken and boys and staff will take protective positions along the gym walls until Admin declares an "All–Clear." No one will leave the building until possible damage has been located and assessed by Maintenance and Admin. Decisions will be made at that time, based on all available information, of which further course to follow and directions to

staff and campers will be given accordingly.

Straus Decl. Exh. C.

The camp also has procedures for tree maintenance. The camp's caretaker, Glenn Zaidman, inspects the bushes and trees in the active areas of the camp on a daily basis. Zaidman is not a licensed arborist, and is not licensed to inspect trees. If Zaidman notices any problems, he contacts local arborist Paul Protty of Protty Tree Service. The plaintiffs dispute this, noting only that Protty visited the camp on occasion "to undertake certain tree care matters, if requested by defendants." Pl. Rule 56.1 Statement, at 5. The defendants describe Protty's inspections as consisting of "looking at each tree with the naked eye and binoculars for any external signs of fungal infection or rot and knocking on the tree to check for [hollow] areas or easily peeled bark," as well as "observing trees on windy days and climbing trees when necessary." Def. Rule 56.1 Statement at 5. The plaintiffs note that Protty could not testify with certainty that he inspected the tree which fell on Jory Lesser, and did not inspect the tree at or around the point where it failed—15 to 20 feet above the ground. See Pl. Rule 56.1 Statement at 5.

The fireworks display was set up and launched by Zaidman. In addition to being the camp's caretaker, Zaidman is a pyrotechnician licensed by the State of Maine to discharge fireworks. Zaidman testified that he periodically and repeatedly checked the weather on the internet at "weather.com Yahoo." Straus Decl. Exh. D at 69. The plaintiffs dispute this, citing the testimony of one of the defendants that "[i]n the year 2000 he [Zaidman] wanted nothing to do with computers." Pl. Rule 56.1 Statement at 9. The plaintiffs also note that the possibility of thunderstorms had been noted by the National Weather Service as early as 9:30 PM on July 3. Id. at 9–10.

The fireworks display commenced sometime after sunset, which was at 8:29 P.M. There were approximately 800 counselors, staff and campers in attendance. According to the defendants, there was no wind or rain when the display commenced, although plaintiffs note that defendant Mark Meyer testified that the sky was overcast after dinner, around 7 P.M. Soon after the fireworks display commenced, it started to rain. The rain and wind intensified in a very short period of time. Defendants Mark Meyer and Peter Meyer and nonparty Daniel Isdaner testified that they and "all counselors in attendance immediately shouted instructions to evacuate the beachfront and seek shelter in nearby bunks." Def. Rule 56.1 Statement at 6.

Plaintiff Jory Lesser acknowledges having heard and heeded the shouted instructions and proceeded through the Junior Grove. The defendants assert that Jory Lesser was heading toward the bunks, Def. Rule 56.1 Statement at 7, but plaintiffs counter that he "was lost and confused and never saw a bunk." Pl. Rule 56.1 Statement at 13 (citing Mosley Decl. Exh. G at 46–48 (J. Lesser Dep.)). While in the Junior Grove, Jory Lesser was struck and injured by a falling tree. The trunk of the tree snapped approximately 15–20 feet from the ground, and the portion of the tree that fell was approximately 100 feet in length.

### Motion to Preclude Expert Testimony

#### Standard of Review

The standard for the admissibility of expert testimony is set forth in Federal Rule of Evidence 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qual-

ified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the case.

Fed.R.Evid. 702.

The standard was the subject of extensive analysis by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *Daubert* charges "trial judges with the responsibility of acting as 'gatekeepers,'" in light of the fact that "the Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Salim,* 189 F.Supp.2d 93, 99–100 (S.D.N.Y.2002) (*quoting Daubert,* 509 U.S. at 597, 113 S.Ct. 2786). Thus, "[t]he determination as to the relevance and reliability of such evidence is committed to the sound discretion of the trial court." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. In *Kumho Tire Co. v. Carmichael,* the Supreme Court clarified that this gatekeeper function applies to all expert testimony, not just scientific testimony. 526 U.S. at 147, 119 S.Ct. 1167 (explaining that Rule 702 makes "no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. It makes clear that any such knowledge might become the subject of expert testimony.").

The Supreme Court provided district courts with a checklist for assessing the reliability of expert testimony. This list of "specific factors" "neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141, 119 S.Ct. 1167.

Listed considerations include whether an expert's theory can be tested, "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error", and "general acceptance." *Daubert,* 509 U.S. at 593–594, 113 S.Ct. 2786. As repeatedly stressed, the "list of factors was meant to be helpful, not definitive." *Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167. *See also Daubert,* 509 U.S. at 594, 113 S.Ct. 2786 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."); *Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 266 (2d Cir.2002) ("[T]he *Daubert* inquiry is fluid and will necessarily vary from case to case."). Thus, "[t]he trial court is to use its discretion to determine what are reasonable criteria of reliability and whether the proposed testimony meets those criteria based on the peculiarities of the case before it." *Primavera,* 130 F.Supp.2d at 522.

However, "[t]he Rules' basic standard of relevance ... is a liberal one," *Daubert,* 509 U.S. at 587, 113 S.Ct. 2786, and "the district court's *Daubert* gatekeeping role does not permit the district court, in ruling on evidentiary sufficiency, to reject admissible expert testimony." *Amorgianos,* 303 F.3d at 267–268. As the Advisory Committee noted, "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed.R.Evid. 702, Advisory Comm. Notes.

### The Testimony of Plaintiffs' Tree Expert is Admissible

The plaintiffs retained Terry A. Tattar, Ph.D., a forestry and tree pathology expert, to diagnose the tree that fell on the plaintiff Jory Lesser. Dr. Tattar holds a doctorate in the field of "tree decay," and is often asked to teach about hazardous trees. *See* Mosley Decl. Exh. C (Tattar curriculum vitae). He has authored books

and journal articles on tree pathology and diagnosis. *Id.*

Defendants argue that the opinions of Dr. Tattar were not based on empirical testing, that his opinions have not been subjected to review, analysis or criticism by his peers, and that because his conclusions are based on speculation, there are no known or potential rates of error.

Dr. Tattar was not able to conduct any empirical testing on the subject tree because the defendants destroyed the tree. Accordingly, Dr. Tattar relied on photographs, depositions by both parties and non-party witnesses, forestry texts, and a report by Donald Whitney, a tree expert retained by the defendants, in forming his opinion.

Dr. Tattar's report states that the subject tree had an "abnormally small diameter ... for its height," and would therefore be likely to fail in a wind storm. Mosley Decl. Exh. B. The report also notes the presence in the tree of "an electrical insulator that had woody stem tissue grown over it ..." *Id.* The attachment of such an insulator causes wounds to the tree, which would lead to infections and "to strength loss and to ultimate failure of the trunk." *Id.* The report also concludes that the discoloration of the outer surface of the tree combined with the manner in which the tree broke suggest that infection was a contributing cause of the tree's failure.

■ Dr. Tattar is well-qualified to offer an opinion on any pathologies to which the subject tree may have been subjected. Defendants, however, question whether Dr. Tattar has performed sufficient empirical testing to support the conclusions he makes as to the subject tree. Defendants note that despite the unavailability of the tree, Dr. Tattar has not examined any of the other trees in the same grove to see whether they are also abnormally thin or whether they also contained similar implements that would have caused similar infections.

Neither *Daubert* nor *Kumho Tire* requires physical examination where informed and reasonable empirical inferences can be made from photographic evidence and the reliable testimony of others. As explained in the Advisory Committee Notes to amended Rule 702, the *Daubert* factor relating to "whether the expert's technique or theory can be tested" means "whether the expert's theory can be challenged in some objective sense, or whether it instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." Dr. Tattar's report makes clear the evidence he is relying on to form his conclusions. It is clearly possible to test those conclusions objectively.

The defendants characterize Dr. Tattar's opinions as "unsubstantiated and speculative." Def. Mem. at 4. However, Dr. Tattar's opinions are substantiated by photographs which document both the diameter of the tree and its height. Given Dr. Tattar's background in tree pathology, such information is sufficient to make an inference as to the relative frailty of the tree. Similarly, the report by defendants' tree expert of the presence of the electrical insulator, and the fact that the insulator had woody stem tissue grown over it, is a sufficient empirical basis on which to form conclusions about the presence of microbial infections in the tree, and the effect that such infections have on the strength of the tree.

The defendants further argue that peer review of Dr. Tattar's conclusions is impossible because he "performed no testing and employed no plant pathology methodologies." Def. Mem. at 6. The defendants also argue that Dr. Tattar must be able to describe which species infected the tree.

By destroying the tree, the defendants have made it impossible for Dr. Tattar to

identify the species that may have infected the tree. However, Dr. Tattar has adequately explained that the stressed condition of the tree, as shown by its abnormally small diameter, made it susceptible to infection. Mosley Decl. Exh. J, Tattar Dep. at 210–11. Dr. Tattar has also examined photographs of the tree which show objective indicia of decay, such as the brash break over the surface of the interior of the tree, and discoloration in the tree's flesh. It is possible, given Dr. Tattar's expertise, to make conclusions based on such empirical data, just as it would be possible for a peer to review and to criticize Dr. Tattar's report.

Finally, the defendants' argument that there are no known or potential rates of error is misplaced. Dr. Tattar has formed reasonable inferences based on photographic evidence and other evidence from witnesses. Such inferences are not governed by statistical methods which would generate numerical rates of error. They are fallible conclusions, however, as are the conclusions of any expert, and may be challenged by competing experts retained by defendants.

As the Honorable Jack B. Weinstein observed, "too nitpicking an approach to find reasons to exclude expert testimony from distinguished scientists will tend to drive the best of them out of the courtroom. The greatest danger to the courts is not the incompetent who will testify for pay, but our failure to encourage sound scientists to assist the law." *Falise v. American Tobacco*, 258 F.Supp.2d 63, 68 (E.D.N.Y.2000). Accordingly, the report and testimony of Dr. Tattar is admissible.

### The Plaintiffs' Camp and Recreational Safety Expert May Testify With Respect to American Camping Association Standards

The plaintiffs retained David H. Fried, a camp and recreational safety expert, to opine on the defendants' compliance with the standards and guidelines developed by the ACA. Fried is the president of DEP Accident Analysis, Inc., which provides services as sports, recreation and educational safety consultants. He has published articles on sports and recreational injuries and on playground safety, and has given public presentations on these and related topics.

The defendants argue that Fried's opinions would not assist the trier of fact with understanding scientific, technical or specialized knowledge, and that opinions based on generalized knowledge are unreliable. The defendants also argue that if Fried's opinions are deemed to be specialized knowledge, they should be subject to the strict gatekeeping function required by *Daubert*. Finally, the defendants argue that Fried relies on the fact of plaintiff's injury to "bootstrap" his opinion that the defendants failed to exercise due care, meaning that the sole basis for concluding that defendants were negligent is that Jory Lesser was injured.

The plaintiffs reply that because the defendants have repeatedly claimed that they have complied with ACA standards and that ACA camps are safer, it is important for plaintiffs to be able to rebut this claim through a qualified camp and recreational safety consultant. The plaintiffs also seek to admit Fried's testimony on the issue of whether defendants provided adequate supervision to the plaintiff Jory Lesser, and on defendants' failure to monitor weather forecasts.

█ Fried has sufficient expertise on ACA procedures to testify as to the extent of Camp Wildwood's compliance with those standards. Fried has been a camp director or consultant for over forty years. *See* Mosley Decl. Exh. D, Fried curriculum vitae. Further, he has prepared safety plans for camps and has been responsible

for preparing applications for ACA certification.

■ Fried may not testify, however, as to his conclusions on the issue of whether the defendants provided adequate supervision to the plaintiff. The adequacy of the supervision of the plaintiff on July 4, 2000 is an issue that extends beyond compliance with ACA standards. It may be the case, as defendants have suggested, that "even had the camp cured all of its allegedly negligent procedures prior to the fireworks event," *see* Def. Reply Mem. at 16, the plaintiff would still have been injured by the falling tree. Fried's conclusions apart from the issue of compliance with ACA standards therefore intrude into an area in which the trier of fact is adequately able to form an opinion. The Supreme Court has held that,

> conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). This does not mean, as the defendants have suggested, that "Fried has not and cannot tie the underlying facts to his opinions regarding the alleged inadequacy of the camp's safety procedures," but only that it is not necessary to draw on Fried's expertise to assist the trier of fact in deciding whether such a connection is warranted.

■ The same rationale applies to Fried's conclusion that defendants failed in their obligation to make certain that the children were not assembled outside in bad weather. Expert testimony is not required to ascertain whether defendants should have checked weather forecasts or whether defendants did in fact check. These issues are not within the domain of "scientific, technical, or other specialized knowledge" within the meaning of Rule 702.

### Summary Judgment Motion

#### Standard of Review

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir.2002).

Both parties are in agreement that New York law applies to the plaintiffs' negligence claims.

### Defendants' Motion for Summary Judgment is Denied As to the Negligent Supervision Claim

■ Under New York law, entities to whom custody of children is entrusted,

such as schools, camps or similar institutions, have a duty to exercise the same degree of care as would a reasonably prudent parent under similar circumstances. *See Mirand v. City of New York,* 84 N.Y.2d 44, 49, 637 N.E.2d 263, 614 N.Y.S.2d 372 (1994); *Gustin v. Ass'n of Camps Farthest Out, Inc.,* 267 A.D.2d 1001, 1002, 700 N.Y.S.2d 327 (4th Dept. 1999). Persons having children entrusted to their care are "charged with the highest degree of care." *Willis v. YMCA,* 28 N.Y.2d 375, 379, 270 N.E.2d 717, 321 N.Y.S.2d 895 (1971) (*quoting Oldham v. Hoover,* 140 So.2d 417, 421 (La.Ct.App. 1962)). The care of children "requires 'more vigilance' than would be required for adults." *Id.* (quoting 65 C.J.S. Negligence § 12, subd. b, p. 588).

It is true, however, that camps, like schools, "are not insurers of safety … for they cannot reasonably be expected to continuously supervise and control all movements and activities of students." *Mirand,* 84 N.Y.2d at 49, 614 N.Y.S.2d 372, 637 N.E.2d 263. Organizers of recreational events "owe a duty to exercise only reasonable care to protect participants 'from injuries arising out of unassumed, concealed or unreasonably increased risks.'" *Fintzi v. New Jersey YMHA–YWHA Camps,* 97 N.Y.2d 669, 670, 765 N.E.2d 288, 739 N.Y.S.2d 85 (2001); *see also Gustin,* 267 A.D.2d at 1003, 700 N.Y.S.2d 327 ("In the setting [of a summer camp], constant supervision is neither feasible nor desirable because one of the benefits of such an institution is to inculcate self-reliance in the campers which an overly protective supervision would destroy").

The defendants argue that plaintiffs have failed to establish a *prima facie* claim of negligence because the supervisory and precautionary procedures established by Camp Wildwood were reasonable and were followed during the storm which arose on July 4, 2000. When the storm hit, camp personnel instructed campers to go to their bunks. Jory Lesser heard these instructions and according to defendants, knew where the bunks were, heeded the instruction and headed toward the bunk. Defendants also note that the plaintiffs' recreational safety expert "has acknowledged that the bunks were the closest shelter available and [were located] a safe distance from the waterfront for the purposes of evacuating the campers." Def. Summ. J. Mem. at 7.

The plaintiffs counter that defendants had an inadequate safety plan and that there was a "total lack of camper supervision" on the evening in question. Pl. Summ. J. Opp. Mem. at 27. Plaintiffs further argue that defendants breached their duty to the plaintiff by (1) failing to conduct evacuation procedures and drills; (2) failing safely to accommodate and plan for an evacuation of all the campers including visiting campers; (3) failing to properly train and supervise the counselors in terms of an evacuation plan; and (4) failing to develop a plan to adequately monitor the weather so as to be apprised of an approaching storm.

Plaintiffs cite the testimony of defendant Mark Meyer to the effect that there was no evacuation plan in effect that day to evacuate people on the waterfront in the event of bad weather. *Id.* at 28 (citing Mosley Decl. Exh. F at 160 (M. Meyer Dep.)). Further, plaintiffs' expert has noted "a failure to have or practice a specific evacuation plan for a storm at the fireworks event, a failure to assign … counselors to be responsible for particular campers in the event of an emergency, and a failure to organize the campers in order that they would remain together under direct supervision of counselors assigned to their safety." *Id.* (citing Mosley Decl. Exh. D (Fried Report); Exh. K (Fried Dep.)).

According to evidence presented by the plaintiffs, there was also no rehearsal of any safety plan or communication of the plan to counselors, despite the requirement of training and/or rehearsal in the ACA Standards Manual. *See* Mosley Decl. Exh. N at OM–14 (ACA Accreditation Standards) ("Training for or rehearsal by campers may be appropriate in some situations such as fire or storm drills.").

Plaintiffs also argue that even if the procedures in place were adequate, they were not followed on the evening in question. The camp's procedures call for campers to be "escorted" from the waterfront in the event of a storm. Def. Rule 56.1 Statement, ¶ 10. The defendants have produced no evidence that Jory Lesser was escorted from the waterfront. Immediately prior to being injured, Jory Lesser testified that he saw "one other camper, but no counselors or no adult supervisors" outside the bunks. Mosley Decl. Exh. G at 71–72.

Defendants argue that any alleged breach of supervisory duties was in any case not the proximate cause of plaintiff's injuries. They argue that Jory Lesser was struck by a tree downed by strong winds even though he was evacuating the waterfront in the manner instructed. They cite plaintiffs' expert, who defendants claim has conceded that "any number of trees could have fallen on any number of individuals" even if the evacuation procedures proposed by the expert were followed. Def. Summ. J. Mem. at 9 (quoting Straus Decl. Exh. J. at 204 (Fried Dep.)).

Plaintiffs dispute the defendants' claim that Jory Lesser was following the camp's evacuation procedures and argue conversely that "he was, in fact, confused as to where to go for shelter and lost in the chaos of the poor evacuation." Pl. Summ. J. Mem. at 41. Lesser testified that after the order was shouted to get to the bunks, "[i]t was like 800 chickens running around with their heads cut off." Mosley Decl. Exh. G at 47.

The defendants have also misrepresented the testimony of the plaintiffs' expert, David Fried. After stating that "any number of trees could have fallen on any number of individuals," he also asserts that "the chance of Lesser being hit by a tree would be infinitesimal in my opinion if he had been able to follow his counselor ..." Straus Decl. Exh. J at 204. Fried makes several other similar statements throughout his deposition. *See, e.g.,* Mosley Decl. Exh. K at 198 ("... if the counselor ... had supervised Lesser, the chances of Lesser being hit by a tree would probably be zero because his counselor wasn't hit by a tree.").

While it is possible to infer that Lesser would have been struck by the tree no matter what procedures the counselors followed, it is also possible to infer that the counselors failure to escort him was the proximate cause of his injuries. "Proximate cause is a question of fact for the jury where varying inferences are possible." *Mirand,* 84 N.Y.2d at 51, 614 N.Y.S.2d 372, 637 N.E.2d 263; *see also Greaves v. Bronx YMCA,* 87 A.D.2d 394, 399, 452 N.Y.S.2d 27 (1st Dep't 1982).

■ Based on the evidence presented, and making all reasonable inferences in favor of the plaintiffs, there is a genuine issue of material fact on the issues of whether defendants provided adequate supervision and whether any inadequate supervision was the proximate cause of plaintiff's injuries. Summary judgment is therefore inappropriate. In negligent supervision cases, the questions whether the actions of the defendants "are adequate and reasonable and, if they are not, whether the negligence is the proximate cause of plaintiff's injuries, *are almost always questions of fact."* *Garcia v. City of New York,* 222 A.D.2d 192, 194, 646 N.Y.S.2d 508 (1st

Dep't.1996) (emphasis added). The present case is no exception.

### Defendants' Motion for Summary Judgment is Denied As to the Premises Liability Claim

Under New York law, a premises or landowner "owes a duty to persons coming upon his or her land 'to keep it in reasonably safe condition considering all the circumstances, including the purpose of the person's presence on the land and the likelihood of injury.'" *Gustin*, 267 A.D.2d at 1002, 700 N.Y.S.2d 327 (*quoting Duclos v. County of Monroe*, 258 A.D.2d 925, 926, 685 N.Y.S.2d 549 (4th Dept.1999)). To establish a *prima facie* case of negligence, the plaintiff must "demonstrate either that the defendants created the dangerous or defective condition which caused the accident, or that they had actual or constructive notice of the condition." *Dima v. Breslin Realty, Inc.*, 240 A.D.2d 359, 360, 658 N.Y.S.2d 115 (2d Dep't.1997) (*citing Gordon v. American Museum of Natural History*, 67 N.Y.2d 836, 501 N.Y.S.2d 646, 492 N.E.2d 774 (1986)).

█ In cases involving fallen trees or branches, a landowner will only be held liable if he or she knew or should have known about a defective condition of the tree. *Ivancic v. Olmstead*, 66 N.Y.2d 349, 351, 488 N.E.2d 72, 497 N.Y.S.2d 326 (1985); *Harris v. Village of East Hills*, 41 N.Y.2d 446, 450, 362 N.E.2d 243, 393 N.Y.S.2d 691 (1977); *Asnip v. State of New York*, 300 A.D.2d 328, 751 N.Y.S.2d 316 (2d Dep't 2002). Constructive notice will be imputed if "the record establishes that reasonable inspection would have revealed the dangerous condition of the tree," *Harris*, 41 N.Y.2d at 449, 393 N.Y.S.2d 691, 362 N.E.2d 243, or where the defendant has no program in place to inspect trees, *see Hilliard v. Town of Greenburgh*, 301 A.D.2d 572, 573, 754 N.Y.S.2d 29 (2d Dep't 2002). The meaning of "reasonable inspection" has been considered recently by the New York Court of Claims:

> What level of inspection is "reasonable" varies depending on the circumstances, with a higher level of attention being given to trees that are so located that falling branches are likely to come into contact with members of the public, as compared to the attention to be accorded trees that are located some distance away from the traveled area. Relevant factors to be considered are whether signs of decay or other problems that have been observed by neighbors and other passers-by; whether the tree itself had to have branches removed or received other attention in the past; whether there is knowledge or evidence of climatic conditions or changes to the contour of the adjoining land that might impact the health of the tree; whether other similar trees have been found to be diseased and are removed; and the presence or absence of bark and foliage. ... Weather conditions that are so extreme as to constitute an act of God may provide a defense, but reasonable care "requires precaution as well against the extraordinary as against the ordinary" and it is only the truly unforeseeable that can serve as a separate, intervening cause.

*Gugliotta v. State of New York*, Claim No. 96538, 1999 N.Y. Misc. LEXIS 667, at *17–*19 (Ct. Claims November 3, 1999) (*quoting Edgett v. State*, 7 A.D.2d 570, 571, 184 N.Y.S.2d 952 (3d Dep't 1959)) (citations omitted).

Summary judgment should be granted only when there is no credible evidence that the dangerous condition of the tree could have been revealed prior to the accident. *See Asnip*, 300 A.D.2d at 329, 751 N.Y.S.2d 316 (summary judgment granted where tree trunk showed no evidence of

"any visible, outward sign of decay"); *Leach v. Town of Yorktown,* 251 A.D.2d 630, 631, 676 N.Y.S.2d 209 (2d Dep't.1998) (same).

The defendants argue that their inspection procedures are reasonable. However, "[t]he issue is not whether the responsible party actually had an inspection program in place but, rather whether reasonable inspection—if it had taken place—would have revealed the defect." *Gugliotta,* 1999 N.Y. Misc. LEXIS 667 at *17.

Defendants also argue that the evidence of the subject tree's weakened state presented by the plaintiffs' expert, Dr. Tattar, is contradicted by clear evidence and is therefore insufficient to defeat summary judgment. They argue that the plaintiffs have not put forward any evidence "that the purported 'wood rot fungi' observed by Dr. Tattar in the interior tissue of the tree was visible on the outward, exterior surface of the tree." Def. Summ. J. Mem. at 13.

Plaintiffs reply that the defendants had actual knowledge that the tree was stressed from the fact that it was abnormally thin for its height. They also point to the photographic evidence of discoloration in the tree in the area where the tree failed. Dr. Tattar testified that the photographs disclose what "appears to be . . . an infection on one side of the tree that caused discoloration and altering of the condition of the tissue at the fracture point . . ." Mosley Decl. Exh. J at 223.

The defendants also argue that even if a reasonable inspection would have revealed that the tree was in a dangerous condition, the condition of the tree is not the proximate cause of the plaintiff's injuries. According to the defendants, the plaintiffs have only provided speculative evidence that the conditions of the tree caused it to fall on the plaintiff. Further, the storm conditions which arose at the time of the incident were an "act of God."

The plaintiffs reply that Dr. Tattar's report concluded that "the tree likely failed in a combination of microbial activity and/or because it was abnormally thin and broke because of that condition." Mosley Decl. Exh. J at 204. They also argue that the "act of God" defense fails both because the weather conditions could have been anticipated and because the defects in the tree contributed to the tree's failure.

■ While it is true that the plaintiffs' expert has acknowledged that even non-defective trees may fail in a sufficiently severe windstorm, it is not the case that plaintiffs' have put forward no evidence suggesting that the tree's defective condition is the proximate cause of Jory Lesser's injuries. The defendants have noted that Dr. Tattar has failed to specify the wind speeds at which defective and non-defective trees would fail, and the actual wind speeds of the storm that hit the camp. Such detailed information is not necessary to defeat summary judgment. It is sufficient at the present stage that plaintiffs have presented evidence that the tree evidenced a "brash break" at the point where it failed. A brash break "does not have splinters. It breaks almost in a flat line and just simply breaks . . . whereas a splinter breaks with lots of vertical splinters. Pieces of wood sticking up." Mosley Decl. Exh. J at 241. In a normal, healthy tree, the break point would be splintered. The evidence that the tree failed at the point where it was apparently defective is sufficient to raise a question of fact as to whether the defect was the proximate cause of the plaintiff's injuries. It is not necessary at this stage in the litigation to rule out decisively the possibility that even a non-defective tree would have failed.

The defendants have not put forward sufficient evidence to establish their "act of God" defense as a matter of law. An injury is caused by an "act of God" when,

it happens by direct, immediate and exclusive operation of the forces of nature, uncontrolled or uninfluenced by the powers of man and without human intervention, and is of such a character that it could not have been prevented or escaped by any amount of foresight or prudence, or by any reasonable amount of care or diligence.

*Pickersgill v. City of New York,* 168 Misc.2d 768, 769, 642 N.Y.S.2d 469 (N.Y.City Civ.Ct.1996) (*quoting Joseph Resnick Co. v. Nippon Yusen Kaisha,* 39 Misc.2d 513, 514, 241 N.Y.S.2d 134 (1963)). To invoke this defense, the weather conditions must be "so extraordinarily harsh" and "unusual" as to not be reasonably anticipated by the defendant. *Id.* at 769–770, 642 N.Y.S.2d 469; *see also Prashant Enterprises, Inc. v. State,* 206 A.D.2d 729, 730, 614 N.Y.S.2d 653 (3d Dep't 1994). Further, New York courts will deny such a defense if negligence on the defendants part is found. *See Edgett,* 7 A.D.2d at 571, 184 N.Y.S.2d 952 ("If negligence is proved against the State ... the unprecedented storm ... was no absolute defense.").

Defendants claim, based on their retained meteorological expert, that the camp was struck by an extremely severe, very rare and unpredictable weather phenomenon known as a "downburst" that produced winds in excess of 70 mile per hour. According to defendants' expert, winds of that speed strike the geographical area in which the camp is located approximately once every hundred years. The plaintiffs contest the strength of the storm. More importantly, the plaintiffs have also submitted evidence that the National Weather Service had predicted thunderstorms for the evening of July 4, 2000. Even if the storm which actually occurred was as rare as the defendants claim, the injuries which plaintiffs argue were caused by the defective tree could have been "prevented or escaped" by some "amount of foresight or prudence," *Pickersgill,* 168

Misc.2d at 769, 642 N.Y.S.2d 469, namely, by keeping campers away from trees that evening.

The evidence put forward by the plaintiffs of the tree's abnormal thinness and the discoloration of the tree shown in the photographs and interpreted by the plaintiffs' expert is sufficient to raise a genuine issue of material fact as to whether a reasonable inspection would have revealed the dangerous condition of the subject tree. The plaintiffs have also raised a question of fact as to whether the defective tree was the proximate cause of the plaintiff's injuries. Accordingly, summary judgment is inappropriate on this issue.

### Conclusion

For the foregoing reasons, the defendants' motion to preclude the testimony of Dr. Terry Tattar is denied, the motion to preclude the testimony of David Fried is granted in part and denied in part, and the motion for partial summary judgment is denied.

It is so ordered.